UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

JOHNNY RAY MOORE,                    :    CHAPTER 13
         DEBTOR                          :    CASE NO. 19-51257

JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION,
         MOVANT

VS.

JOHNNY RAY MOORE, DEBTOR
ROBERTA NAPOLITANO, TRUSTEE
    RESPONDENTS

                        :    _____1/16/2020_____

## MOTION FOR RELIEF FROM STAY, IN REM ORDER AND RELATED EQUITABLE RELIEF

     The Movant, JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, a secured

creditor of the above named Debtor, Johnny Ray Moore ("Debtor") with respect to certain real

property having an address of 10 Rosemary Drive, Stratford, CT 06615 ("Property") by and through

its undersigned attorneys, pursuant to 11 U.S.C. Section 105 and 362 requests an *in rem* Order and

related equitable relief enter, and as grounds therefore respectfully represents the following to the

Court:

     1.    The Debtor, Johnny Ray Moore, has executed and delivered or is otherwise obligated

with respect to that certain promissory note in the original principal amount of $267,000.00

("Note").  A copy of the Note is attached hereto as Exhibit "A".  Movant is an entity entitled to

enforce the Note and the Mortgage (defined below).

2.      Pursuant to that certain Open-End Mortgage Deed ("Mortgage"), all obligations (collectively, the "Obligations") of the Debtor under and with respect to the Note and the Mortgage are secured by the Property.  A copy of the Mortgage is attached hereto as Exhibit "B".

3.      The Mortgage has been assigned to the Movant pursuant to that certain assignment or assignment of mortgage, a copy of which is attached hereto as Exhibit "C".

4.      At the time of the filing of this Motion, said entity, directly or through an agent, has possession of the promissory note.  The Note is duly endorsed into said entity.  The Movant therefore has standing.

5.      As of December 4, 2019 the Debtor is contractually due for October 1, 2016.

6.      As set forth in the attached Appendix B – Motion for Relief Worksheet,

(a) Pursuant to 11 U.S.C. § 362(d)(1), cause exists for relief from the automatic stay for the following reasons:

1)  The Debtor is contractually delinquent with payments and the non-payment is insufficient to protect Movant's interest.

(b) Pursuant to 11 U.S.C. §362(d)(2), there is no equity in the property and such property is not necessary for an effective reorganization.

7.      The estimated market value of the Property is $225,000.00.  The basis for such valuation is Debtor's Schedule A/B, attached hereto as **Exhibit D**.  The amount of the Movant's debt through December 4, 2019 is approximately $262,538.62.

8.      The Movant is entitled to in rem relief from the automatic stay pursuant to 11 USC Section 362(d)(4) for the following reasons:

a.      The loan is contractually delinquent.

b.      The Debtor has engaged in serial fillings for the sole purpose of

delaying the Movant's foreclosure action as follows:

- On May 31, 2012, Debtor Johnny Ray Moore, filed a Chapter 11 Bankruptcy, Case No. 12-51027. On February 28, 2019, Debtor commenced this bankruptcy proceeding under Chapter 11.  During the pendency of the underlying Chapter 11 case, the Debtor filed various objections to claims, including that of the Movant's Claim of which the Debtor did not prevail on.  The Debtor's Chapter 11 case for a period of over two years without a plan of reorganization in place.  On October 29, 2014, the Court entered an order converting the case to Chapter 7. Said bankruptcy case was terminated with discharge on August 16, 2017.

- On August 29, 2014, Pro Se Debtor Johnny Ray Moore, filed a Chapter 7 Adversary proceeding, Case No. 14-05052. The case dismissed on January 15, 2015 and terminated on February 4, 2015.

- On August 24, 2016, Pro Se Debtor Johnny Ray Moore aka Johnny R. Moore, filed a Chapter 13 Bankruptcy, Case No. 16-51133. Said bankruptcy case was dismissed on January 12, 2018 without a confirmed plan in place because the Debtor's secured debts exceeded the applicable statutory maximum of $1,184,200, pursuant to § 109(e). The case terminated on April 3, 2019. A copy of the order dismissing the case and barring the Debtor from filing for a period of one (1) year is attached as **Exhibit E.  As was the case in the Debtor's prior Chapter 11 case, the Debtor again undertook frivolous litigation against various creditors of which he did not prevail on.  The Debtor then proceeding to appeal various Orders that entered against him which Orders were upheld on Appeal.**

- On December 13, 2017, Pro Se Debtor Johnny Ray Moore, filed a Chapter 13 Adversary proceeding, Case No. 17-05039. The case terminated on April 5, 2018.

- A foreclosure action first commenced against the Debtor on July 16, 2018. **FBT-CV18-6076680-S**.  See **Exhibit F**.

- This instant Bankruptcy Chapter 13 Case No. 19-51257 was filed by Pro Se Debtor Johnny Ray Moore on September 20, 2019. As was the case in the Debtor's prior Chapter 13 case, the Debtor is over the debt limits in this case to be a Debtor under Chapter 13 case.  The Debtor has made no payments to the Movant post-petition int his case and again continues with frivolous pleading practice in this case again for the sole purpose of stalling the underlying foreclosure action.  The Debtor's filed Plan clearly shows the Debtor does not have the financial means to propose any confirmable plan but instead uses the judicial system to not only stall the Movant's underlying foreclosure action while the Debtor retain property without making payments forcing the Movant to carry the property while the Debtor reaps the benefits rent free.  The Debtor has engaged in torturous and frivolous litigation through the pendency of all his bankruptcy cases to date.  The Debtor has for the most part been in bankruptcy for the better part of the last 7 ½ years.  Despite having been barred in the prior Chapter 13 case for a period of 1 year, the Debtor has circumvented that bar by coming back before this court upon the expiration of that bar in an apparent attempt to continue with frivolous litigation in a bankruptcy that he is not eligible to be under.

- Movant requests an Order Granting In Rem Relief from Stay to ensure that it can consummate both its foreclosure action and any subsequent eviction action commenced against any party either holding title or possession of the Property without

interference of another bankruptcy filing by a party in interest.

- Upon information and belief, the Borrower, in an effort to delay, hinder or defraud the Movant had previously and similarly filed bankruptcy petitions immediately prior to scheduled foreclosure sale dates.

9.    As a result of the prior bankruptcies filed by the Debtor which were dismissed, the Creditor seeks in rem relief so that that any petition filed by or against the Debtor individually or jointly or by any insider of the Debtor, see 11 U.S. C. § 101(31), or other person with an interest in the Property, prior to the completion of the Movant's efforts to enforce its rights concerning the Property and all appeals related thereto, shall not operate as a stay (or trigger a stay) under Bankruptcy Code Section 362(a) as to the Property, provided, that any such prospective debtor, may seek on an expedited basis an order of the undersigned judge, or the judge assigned the newly filed bankruptcy case, relieving them from the prejudice of this paragraph. Such prospective Debtor's request for such relief shall be by written motion properly noticed and served upon the Movant and/or its successors(s) and assigns, accompanied by (i) a copy of this Court's Order Granting Relief from the Automatic Stay and (ii) an affidavit attesting that they are not, directly or indirectly, associated with the Debtor except to the extent of being a good faith transferee with regard to the Property, setting forth with the particularity the status of the Movant's foreclosure or eviction efforts as to the Property, and particularizing and attesting that there are new and exceptional circumstances warranting application of Section 362(a) to the Property in the newly filed case notwithstanding this order.  In the alternative, the Movant seeks relief from the current automatic stay and prospective relief as to any future bankruptcy stay as a result of any bankruptcy filing by this Debtor.  In the alternative, the Movant requests relief from the automatic stay in this bankruptcy case.

10.    The Movant also requests that this court order that Bankruptcy Rule 4001(a)(3) is not applicable so that Movant may immediately enforce and implement the requested order modifying the stay.

11.    The Movant also requests that, to the extent that there exists a co-debtor stay under 11 U.S.C. §1301(a), the Movant requests that the same be modified by allowing Movant to enforce its interest in the Property against the co-debtor.

WHEREFORE, Movant prays that this Court issue an Order terminating or modifying the stay and granting the following:

1.    Relief from the automatic stay pursuant to 11 U.S.C. §362(d)(4) allowing Movant, its successors or assign, to proceed under applicable non-bankruptcy law to enforce its remedies to foreclose upon and obtain possession of the Property.

2.    That the 14-day stay described by Bankruptcy Rule 4001(a)(3) be waived.

3.    Further, to the extent that there exists a co-debtor stay under 11 U.S.C. §1301(a), the Movant requests that the same be modified by allowing Movant to enforce its interest in the Property against the co-debtor.

By:    */s/Linda  St. Pierre*
   Linda J. St. Pierre, Esq.
   McCalla Raymer Leibert Pierce, LLC
   50 Weston Street
   Hartford, CT 06120
   Fed Bar No. CT 22287

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

JOHNNY RAY MOORE,                          :      CHAPTER 13
       DEBTOR                          :      CASE NO. 19-51257

JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION,
          MOVANT

VS.

JOHNNY RAY MOORE, DEBTOR
ROBERTA NAPOLITANO, TRUSTEE
    RESPONDENTS

                                     :      _____

## ORDER GRANTING JPMORGAN CHASE BANK, NATIONAL ASSOCIATION MOTION FOR EQUITABLE RELIEF AND IN REM ORDER

     The Motion for Relief from Automatic Stay in the above entitled matter having come before the court, it is hereby ORDERED:

     1.  That the Automatic Stay in the above-captioned case be modified to permit JPMORGAN CHASE BANK, NATIONAL ASSOCIATION and/or its successors and assigns to allowing Movant, its successors or assign, to proceed under applicable non-bankruptcy law, including but not limited to, enforcing its remedies to foreclose upon and obtain possession of real property known as 10 Rosemary Drive, Stratford, CT 06615 .

     2.  That Debtor shall be barred from filing any petitions for relief under Title 11 for 2 years.

     3.  That the Debtor is enjoined from transferring in any way any interest in the real property known as 10 Rosemary Drive, Stratford, CT 06615 for a period of 2 years.

     4.  This Order shall be binding on the Debtor and the record owners of the property for a

period of 2 years.  The Order shall be binding on and in any subsequent Title 11 filings by any owner/occupant of the property such that the stay shall remain lifted until the foreclosure action is complete.  The Order shall be recorded on the Town of Stratford, County of Fairfield Superior Court Land Records.  Notice shall be given to such Connecticut state court or judicial authority conducting the foreclosure sale.  Any successors or assigns to the property, by deed, mortgage, lien or any other recorded instrument shall take such interest subject to this Order.

By:   */s/Linda  St. Pierre*
Linda J. St. Pierre, Esq.
McCalla Raymer Leibert Pierce, LLC
50 Weston Street
Hartford, CT 06120
Fed Bar No. CT 22287

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

JOHNNY RAY MOORE,                    :    CHAPTER 13
      DEBTOR                          :    CASE NO. 19-51257

JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION,
        MOVANT

VS.

JOHNNY RAY MOORE, DEBTOR
ROBERTA NAPOLITANO, TRUSTEE
    RESPONDENTS

                                :    _____

<u>PROPOSED ORDER GRANTING JPMORGAN CHASE BANK, NATIONAL ASSOCIATION
RELIEF FROM STAY</u>

        After notice and a hearing, <u>see </u>Bankruptcy Code Section 102(1), on JPMORGAN CHASE

BANK, NATIONAL ASSOCIATION (hereafter the "Movant") Motion for Relief from Stay,

(hereafter, the "Motion"), RE: ECF NO.____.

        **IT IS HEREBY ORDERED** that the Motion is Granted - the Automatic Stay of 11 U.S.C.

§ 362(a) is modified to permit the Movant and/or its successors and assigns to commence and/or

continue and prosecute to resolution a foreclosure action and otherwise exercise its rights, if any

with respect to real property known as 10 Rosemary Drive, Stratford, CT 06615 in accordance with

applicable state law;

        **IT IS FURTHER ORDERED** that the 14 day stay of Fed.R.Bankr.P. 4001(a)(3) is not

applicable and the Movant may immediately enforce and implement this Order.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

JOHNNY RAY MOORE,                :   CHAPTER 13
        DEBTOR               :   CASE NO. 19-51257

JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION,
           MOVANT

VS.

JOHNNY RAY MOORE, DEBTOR
ROBERTA NAPOLITANO, TRUSTEE
      RESPONDENTS

                               :        1/16/2020

## NOTICE OF CONTESTED MATTER RESPONSE DEADLINE

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION (the "Movant") has filed a Motion

for Relief from Automatic Stay, (the "Contested Matter") in the above-captioned case.  Notice is

hereby given that any response to the Contested Matter must be filed with the Court no later than

_____1/30/2020_____, in accordance with Federal Rules of Bankruptcy Procedure 2002(a) and

9014\*.  In the absence of a timely filed response, the proposed order in the Contested Matter may

enter without further notice and hearing, see, 11 U.S.C. §102(1).


Dated: _____1/16/2020_____        By:  */s/Linda  St. Pierre*_____
                                            Linda J. St. Pierre, Esq.
                                            McCalla Raymer Leibert Pierce, LLC
                                            50 Weston Street
                                            Hartford, CT 06120
                                            Fed Bar No. CT 22287


\*Pursuant to Federal Rule of Bankruptcy Procedure 9006(f), if service is made by mail, three
days are added after the response date set in this notice.

**THIS FIRM IS A DEBT COLLECTOR. WE MAY BE ATTEMPTING TO COLLECT A DEBT AND ANY
INFORMATION OBTAINED MAY BE USED FOR THAT PURPOSE. AT THIS TIME, WE ARE ONLY SEEKING TO**

**PROCEED AGAINST THE PROPERTY.  IN THE EVENT OF A BANKRUPTCY DISCHARGE, NO DEFICIENCY JUDGMENT WILL BE ASSESSED AGAINST THE BORROWER**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

JOHNNY RAY MOORE,               :     CHAPTER 13
        DEBTOR           :     CASE NO. 19-51257

JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION,
          MOVANT

VS.

JOHNNY RAY MOORE, DEBTOR
ROBERTA NAPOLITANO, TRUSTEE
     RESPONDENTS

                      :        1/16/2020

## NOTICE OF CONTESTED MATTER RESPONSE DEADLINE CERTIFICATION

The undersigned hereby certifies that on the 16th day of January, 2020 in accordance with applicable law, I served the following documents upon the entities listed below (constituting all entities entitled to notice):

(1)   a copy of the pleading initiating the contested matter, specifically:

       Motion for Relief From Stay, In Rem Order And Related Equitable
Relief;

(2)   a copy of the Proposed Order associated therewith; and

(3)   a Notice of Contested Matter Response Deadline

Johnny Ray Moore
15 Sachem Drive
Shelton, CT 06484
(Pro Se Debtor)

Roberta Napolitano            *(served via ECF Notification)*
10 Columbus Boulevard
6th Floor

Hartford, CT 06106
(Trustee)

U.S. Trustee                                              *(served via ECF Notification)*
Office of the U.S. Trustee
Giaimo Federal Building
150 Court Street, Room 302
Bridgeport, CT 06510
(U.S. Trustee)


By:  */s/Linda  St. Pierre*
      Linda  St. Pierre, Esq.
      McCalla Raymer Leibert Pierce, LLC
      50 Weston St.
      Hartford, CT  06120
      Phone: (860) 808-0606
      Federal Bar No.: CT22287

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - *

In re                                                        :
Johnny Ray Moore

                              Case No. 19-51257
                                 Chapter 13

                               :

Debtor(s)

                               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - *

## RELIEF FROM STAY WORKSHEET-REAL ESTATE

I   Douglas L. Theener            Vice President

(Name and Title)
JPMorgan Chase Bank, N.A.

(Name of Organization/Corporation/Moving Party) (hereinafter, "Movant") hereby declare (or
certify, verify, or state) as follows:

### BACKGROUND INFORMATION

1. Real property address which is the subject of this motion: 10 Rosemary Drive, Stratford,
                                                   Connecticut, 06615

2. Choose One:   ( • ) Lender   ( ) Servicer

  Lender Name       JPMorgan Chase Bank, N.A.

3. Date of Mortgage: January 31, 2007

4. Post-Petition payment address:
3415 Vision Drive, Mail Code: OH4-7142, Columbus, OH 43219.

5. The manner in which the movant perfected its interest in the property:
Recorded Security Instrument

6. All other material liens and encumbrances on the property:
N/A

N/A

N/A

### DEBT/VALUE REPRESENTATIONS

7. Total pre-petition and post-petition indebtedness of Debtor(s) to Movant at the time of filing the
motion: $ 262,538.62

Reviewer ID: Douglas_Theener_2020-01-14_08:50:08

8. Movant's estimated market value of the real property: $ 225,000.00

9. Source of estimated valuation: **Debtor's Schedule A/B**

## STATUS OF DEBT AS OF THE PETITION DATE

10. Total pre-petition indebtednessof Debtor(s) to Movant as of petition filing date:$260,744.65

"Chapter 7" payoff Quote" and chapter 13 "POC"
A. Amount of principal: $ 213,282.28

B. Amount of interest: $ 18,205.90

C. Amount of escrow (taxes and insurance): $ 23,072.17

D. Amount of forced placed insurance expended by Movant: $ 0.00

E. Amount of Attorney's fees billed to Debtor(s) pre-petition: $ 0.00

F. Amount of pre-petition late fees, if any, billed to Debtor(s): $ 0.00

11. Contractual interest rate as of the date of the petition: 4.00%          (If interest rate is (or
was) adjustable, please list the rate(s) and dates(s) the rate(s) was/were in effect on a separate sheet
and attach the sheet as an exhibit to this form; please list the exhibit number here: Exhibit 1          )

12. Only with regard to a post-petition default, explain any additional pre-petition fees, charges or
amounts charged to Debtor's/Debtor's account and not listed above:
 Fees and Costs due: $6,184.30

(If additional space is needed, please list the amounts on a separate sheet and attach the sheet as
an exhibit to this form; please list the exhibit number here :N/A)

### AMOUNT OF ALLEGED POST -PETITION DEFAULT (AS OF)
### 12/04/2019     (MM/DD/YYYY)

13. Date last payment was received: N/A          (mm/dd/yyyy)

14. Alleged total number of payments post-petition from filing of petition through payment due on
(mm/dd/yyyy): 12/01/2019   Number of Months: 3          .

15. List all post-petition payments alleged to be in default:

**SCHEDULE OF PAYMENTS THAT WERE DUE:**

| Date Payment Due | Payment Amount Due Post Petition |
|---|---|
| 10/01/2019 | 1609.71 |
| 11/01/2019 | 1609.71 |
| 12/01/2019 | 1609.71 |
| N/A | 0.00 |
| N/A | 0.00 |
| N/A | 0.00 |
| N/A | 0.00 |
| Totals: | $ 4829.13 |

**SCHEDULE OF PAYMENTS THAT WERE RECEIVED:**

| Date | Amount Received | Amount Applied to Principal and Interest | Amount Applied to Escrow | Late Fee Charged (if any) | Amount Applied to legal fees or cost (specify) |
|---|---|---|---|---|---|
| N/A | N/A | N/A | N/A | N/A | N/A |
| N/A | N/A | N/A | N/A | N/A | N/A |
| N/A | N/A | N/A | N/A | N/A | N/A |
| N/A | N/A | N/A | N/A | N/A | N/A |
| N/A | N/A | N/A | N/A | N/A | N/A |
| N/A | N/A | N/A | N/A | N/A | N/A |
| N/A | N/A | N/A | N/A | N/A | N/A |
| Totals: | $0 | $0 | $0 | $0 | $0 |

16. Amount of Movant's Attorney's fees billed to Debtor for the preparation, filing and prosecution of this motion: $  0.00

17. Amount of Movant's filing fee for this motion: $   181.00 not to be recovered from the debtor.

18. Only to the extent the movant is seeking payment in the motion, the amount of other Attorney's fees billed to Debtor post-petition: $  0.00

19. Only to the extent the movant is seeking payment in the motion, the amount of Movant's post-petition inspection fees: $   0.00

    Only to the extent the movant is seeking payment in the motion, the amount of Movant's post-petition appraisal/broker's price opinion: $   0.00

20. Only to the extent the movant is seeking payment in the motion, the amount of forced placed insurance or insurance provided by the Movant post-petition:  $   0.00

21. Only to the extent the movant is seeking payment in the motion, the amount of the sum held in suspense by Movant in connection with this contract, if applicable:  $ 0.00

22. Only to the extent the movant is seeking payment in the motion, the amount of other post-petition advances or charges: i.e., taxes, insurance incurred by Debtor, etc.: $   0.00

23. Amount and date of post-petition payments offered by the Debtor and refused by the Movant:

| $0.00 | Date: N/A |
|-------|-----------|
| $0.00 | Date: N/A |
| $0.00 | Date: N/A |

## REQUIRED ATTACHMENTS TO MOTION

The following exhibits are attached to the motion in support of the relief requested.

1. Copies of documents that indicate Movant's interest in the subject property. For purposes of example only, a complete and legible copy of the promissory note or other debt instrument together with a complete and legible copy of the mortgage and any assignments in the chain from the original mortgagee to the current moving party. (Exhibit A-C   .)

2. Copies of documents establishing proof of standing to bring this Motion. (Exhibit A-C   .)

3. Copies of documents establishing that Movant's interest in the real property was perfected. For the purposes of example only, a complete and legible copy of mortgage containing the applicable recording information. (Exhibit A-C   .)

## CERTIFICATION AND DECLARATION FOR BUSINESS RECORDS

I certify that the information provided in this worksheet and/or exhibits attached to this worksheet is derived from records that were made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters, were kept in the course of the regularly conducted activity; and were made by the regularly conducted activity as a regular practice.

I further certify that copies of any transactional documents attached to this worksheet as required by paragraphs 1, 2, and 3, immediately above, are true and accurate copies of the original documents, I further certify that the original documents are in movant's possession, except as follows:
N/A

I/we declare (or certify, swear, affirm, verify or state) that the foregoing is true and correct.

Further Affiant Sayeth Not.

Executed on January 14th, 2020

_Daylas R Theene_ 01/14/2020
[signature]
Douglas L. Theener
Vice President
[title]
JPMorgan Chase Bank, N.A.

Subscribed and sworn to before me this Jan. 14, 2020

State of Ohio          County of Franklin

_Heather R Sears_
Notary Public: [name]          Heather R Sears

My commission Expires: 6|5|2021
[date]



# Exhibit 1

JPMorgan Chase Bank, N.A.

Post     Activity Ledger

Loan Level Review:     MFR

| General Loan Information | | |
|---|---|---|
| Loan #: | ▬▬▬ | |
| Case #: | 19-51257 | |
| Date Rec'd File: | 9/20/2019 | |
| As of Date: | 12/4/2019 | |
| Viewable in eCredit: | Yes | |
| Unpaid Principal Balance: | $213,282.28 | |

| Debtor(s) Name: | Johnny Ray Moore |
|---|---|
| Joint Debtor: | N/A |
| Pre Filing State: | CT |
| Confirmation Date: | 10/1/2016 |
| Current Bankr Status: | Active |
| Chapter: | 13 |

◉ Debtor/Trustee Pay     ○ Trustee Pay All

| Current Post Payment Amount: | POC Fil Date: | Client Check: 156 |
|---|---|---|
| $920.64 | 11/22/2019 | Amended POC Fil Date: N/A |
| Exceptions: | Exception Date: | |
| Exception: | Exception Date: | |
| Exception: | Exception Date: | |
| Exception: | Exception Date: | |

| | Payoffs: |
|---|---|
| | Default that year appears |
| | Service Transfer to the loan now being serviced by SPOC? |
| | Will the Pre Petition/Post Petition claim of the Non PON Tried by SPOC? |

Escrow Balance:     -$23,072.17

| Non Credit Events | |
|---|---|
| Event Type/Date | Event Type/Date |
| Event Type/Date | Event Type/Date |

| Action Type | If Applicable, Suspense Debits | Date Received | Amount Received | Amount Due | Post Petition Date Paid | Payment Amount | Check # / Notes | To / From Suspense | (Total Due) |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Post Payment Ledger | | | | |
| | | | | | | | | | $0.00 |
| Delinquent Payment | | | | $1,609.71 | 10/01/19 | 0.00 | | $0.00 | -$1,609.71 |
| Delinquent Payment | | | | $1,609.71 | 11/01/19 | 0.00 | | $0.00 | -$3,219.42 |
| Delinquent Payment | | | | $1,609.71 | 12/01/19 | 0.00 | | $0.00 | -$4,829.13 |

Reviewer ID: Douglas_Theener_2020-01-14_08:50:08

**Summary**

| | |
|---|---|
| Avg Days/Month | 30.42 |
| Interest From | 9/1/2016 |
| Interest To | 12/5/2019 |
| UPB | $213,282.28 |
| Interest Rate | 4.000% |
| Number of Days | 1190.00 |
| Amount Per Day | $23.37 |
| Interest amount | $19,982.02 |
| UPB + interest | $233,264.30 |

| Start Date | Date Value |
|---|---|
| | 10/1/2016 |

**Interest Calculation Table**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Avg Days/Month | 30.42 | 30.42 | 30.42 | 30.42 | 30.42 | 30.42 | 30.42 | 30.42 | 30.42 | 30.42 |
| Interest From | 9/1/2016 | 1/1/2018 | 1/1/2019 | | | | | | | |
| Interest To | 1/1/2018 | 1/1/2019 | 12/5/2019 | | | | | | | |
| UPB | $213,282.28 | $213,282.28 | $213,282.28 | | | | | | | |
| Interest Rate | 2.0000% | 3.0000% | 4.0000% | | | | | | | |
| Number of Days | 487.00 | 365.00 | 338.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| Amount Per Day | $11.68 | $17.52 | $23.37 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Interest amount | $5,688.16 | $6,394.80 | $7,899.06 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| UPB + interest | $218,970.44 | $219,677.08 | $221,181.34 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |

**EXHIBIT A**



# ADJUSTABLE RATE NOTE
## Payment Option

THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THIS NOTE.

JANUARY 31, 2007                 WEST LOS ANGELES          CALIFORNIA
[Date]                                    [City]                              [State]

10 ROSEMARY DRIVE, STRATFORD, CONNECTICUT 06615
[Property Address]

### 1.   BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 267,000.00         (this is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided in this Note. Lender is MORTGAGE CAPITAL ASSOCIATES, INC., A CALIFORNIA CORPORATION

I will make all payments under this Note in the form of cash, check, or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2.   INTEREST

**(A)  Interest Rate**

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will initially pay interest at a yearly rate of         2.500 %. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**(B)  Interest Rate Change Dates**

The interest rate I will pay may change on the   1st  day of  MARCH, 2007         , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. Although the interest rate may change monthly, my monthly payment will be recalculated in accordance with Section 3.

**(C)  Interest Rate Limit**

My interest rate will never be greater than         9.950 %.

**(D)  Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

J℞M

PAYMENT OPTION - MULTISTATE
ADJUSTABLE RATE NOTE - MTA
10/01/05                                   Page 1 of 8                      DocMagic *800-649-1362*
                                                                           www.docmagic.com

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

    (E)  **Calculation of Interest Rate Changes**

    Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE AND 4/10              percentage point(s) (      3.400 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Rate Change Date.

## 3.  PAYMENTS

    (A)  **Time and Place of Payments**

    I will make a payment every month.

    I will make my monthly payments on the    1st   day of each month beginning on MARCH 1 , 2007         . I will make these payments every month until I have paid all the Principal and interest and any other charges that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on FEBRUARY 1, 2037       , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

    I will make my monthly payments at 11150 WEST OLYMPIC BOULEVARD, #1160, WEST LOS ANGELES, CALIFORNIA 90064

                                       or at a different place if required by the Note Holder.

    (B)  **Minimum Payment; Amount of My Initial Monthly Payments**

    My "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment, which the Note Holder will determine in accordance with this Section 3(B), or Section 3(D), 3(F) or 3(G), below, as applicable.

    Each of my initial Minimum Payments will be in the amount of U.S. $ 1,054.97       , until a new Minimum Payment is required as provided below.

    (C)  **Payment Change Dates**

    My Minimum Payment may change as required by Section 3(D) below beginning on the  1st   day of MARCH, 2008      , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My Minimum Payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different amount.

    I will pay at least the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

    (D)  **Calculation of Monthly Payment Changes**

    Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment."

    Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment that will be effective on a Payment Change Date will be in the amount of the Full Payment, except that my new Minimum Payment will be limited to an amount that will not be more than 7.5% greater than the amount of my last Minimum Payment due before the Payment Change Date (this limitation is called the "Payment Change Cap"). The Payment Change Cap applies only to the Principal and interest payment and does not apply to any escrow payments the Note Holder may require under the Security Instrument (as defined in Section 11 of this Note, below).

    (E)  **Additions to My Unpaid Principal**

    My monthly payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. The Note Holder also will add interest on the amount of this

J.R.M

*DocMagic* €Forms 800-649-1362
www.docmagic.com

difference to my unpaid Principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above. For each month that my monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

**(F)    Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal may never exceed a maximum amount equal to 115 % of the Principal amount I originally borrowed.  Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid Principal under Section 3(E) above could cause my unpaid Principal to exceed that maximum amount when interest rates increase.  In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month, regardless of the Payment Change Cap.  This amount will be my new Minimum Payment.  This means that my Minimum Payment may change more frequently than annually.  This new Minimum Payment amount will remain in effect until at least the next regular Payment Change Date, unless another recalculation of my Minimum Payment is required by this Section prior to such Payment Change Date.

**(G)    Required Full Payment**

Regardless of the Payment Change Cap, on the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again.  I also will begin paying at least the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H)    Payment Options**

After the first Interest Rate Change Date, each month the Note Holder may provide me with up to three additional payment options (in addition to the Minimum Payment) that are greater than the Minimum Payment, which are called "Payment Options."  I may be given the following Payment Options:

(i)    **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment at the current interest rate.  The Principal balance will not be decreased by this Payment Option.

(ii)   **Fully Amortized Payment:** the amount necessary to pay the loan off (including all Principal and interest) at the Maturity Date in substantially equal installments.  This Payment Option is calculated on the assumption that the current interest rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change every month.

(iii)  **15 Year Amortized Payment:** the amount necessary to pay the loan off (including all Principal and interest) within a fifteen (15) year period from the first payment due date in substantially equal installments.  This Payment Option is calculated on the assumption that the current rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change every month.

Payment Options will only be available if they are greater than the Minimum Payment.

**(I)    Failure to Make Adjustments**

If for any reason the Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree the Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time.  I also agree not to hold the Note Holder responsible for any damages to me that may result from the Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies that I may have paid to partial Prepayment of unpaid Principal.

**4.    NOTICE OF CHANGES**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change.  The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

JRM

*DocMagic* ☎ *800-649-1362*
*www.docmagic.com*

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

**5.   BORROWER'S RIGHT TO PREPAY ** See attached Prepayment Note Addendum.**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6.   LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

**7.   BORROWER'S FAILURE TO PAY AS REQUIRED**

(A)  Late Charges for Overdue Payments

If the Note Holder has not received at least the full amount of any Minimum Payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue Minimum Payment. I will pay this late charge promptly but only once on each late payment.

(B)  Default

If I do not pay at least the full amount of each Minimum Payment on the date it is due, I will be in default.

(C)  Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D)  No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E)  Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

**8.   GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

J·R·M

PAYMENT OPTION - MULTISTATE
ADJUSTABLE RATE NOTE - MTA
10/01/05                                    Page 4 of 6

DocMagic ⓔⒻⓞⓡⓜⓢ 800-649-1362
www.docmagic.com

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

Usroom.hc

## 9.   OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

## 10.   WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11.   SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

J.RM

PAYMENT OPTION - MULTISTATE
ADJUSTABLE RATE NOTE - MTA
10/01/05                              Page 5 of 6

DocMagic ℰℱℴrms 800-649-1362
www.docmagic.com

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)            _____ (Seal)
JOHNNY RAY MOORE        -Borrower                                  -Borrower


_____ (Seal)            _____ (Seal)
                        -Borrower                                  -Borrower


_____ (Seal)            _____ (Seal)
                        -Borrower                                  -Borrower




*[Sign Original Only]*



J.R.M

PAYMENT OPTION - MULTISTATE                                  DocMagic ⬥ 800-649-1362
ADJUSTABLE RATE NOTE - MTA                                        www.docmagic.com
10/01/05                           Page 6 of 6

WITHOUT RECOURSE PAY TO THE
ORDER OF: **RESIDENTIAL FUNDING COMPANY, LLC**
MORTGAGE CAPITAL ASSOCIATES, INC.
CALIFORNIA CORPORATION

BY: _____
JAY M. STEREN, CORPORATE SECRETARY

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

# PREPAYMENT ADDENDUM TO NOTE

Loan Number █████████

Date: JANUARY 31, 2007

Borrower(s): JOHNNY RAY MOORE

THIS PREPAYMENT ADDENDUM TO NOTE (the "Addendum") is made this    31st     day of
JANUARY,    2007          , and is incorporated into and shall be deemed to amend and supplement
that certain promissory note (the "Note") made by the undersigned ("Borrower") in favor of MORTGAGE
CAPITAL ASSOCIATES, INC., A CALIFORNIA CORPORATION

("Lender") and dated the same date as this Addendum. Repayment of the Note is secured by a Mortgage, Deed of
Trust, or Security Deed (the "Security Instrument") given by Borrower in favor of Lender and dated the same date
as this Addendum. To the extent that the provisions of this Addendum are inconsistent with the provisions of the
Note, the provisions of this Addendum shall supersede the inconsistent provisions of the Note.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Note, Borrower
and Lender further covenant and agree as follows:

Section  5   of the Note is amended to read in its entirety as follows:

## 5 . BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE

I have the right to make payments of Principal at any time before they are due. A payment
of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note
Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not
made all the monthly payments due under the Note.

The Note Holder will use my Prepayments to reduce the amount of Principal that I owe
under the Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid
interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount
of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my
monthly payment unless the Note Holder agrees in writing to those changes.

If the Note contains provisions for a variable interest rate, my partial Prepayment may
reduce the amount of my monthly payments after the first Change Date following my partial
Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest
rate increase. If this Note provides for a variable interest rate or finance charge, and the interest
rate or finance charge at any time exceeds the legal limit under which a Prepayment penalty is
allowed, then the Note Holder's right to assess a Prepayment penalty will be determined under
applicable law.

If within TWENTY-FOUR ( 24 ) months from the date the Security Instrument is
executed I make a full Prepayment or one or more partial Prepayments, and the total of all such
Prepayments in any 12-month period exceeds twenty percent (20%) of the original Principal amount
of the loan, I will pay a Prepayment charge in an amount equal to    SIX    ( 6 )
months' advance interest on the amount by which the total of my Prepayments within any 12-month
period exceeds twenty percent (20%) of the original Principal amount of the loan.

J·R·M

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

Usponn.ppf

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Addendum.

Borrower JOHNNY RAY MOORE          1/31/07          Borrower _____ Date
_____ Date


Borrower _____ Date          Borrower _____ Date


Borrower _____ Date          Borrower _____ Date


MULTISTATE PREPAYMENT ADDENDUM TO NOTE
6/03                                   Page 2 of 2                    DocMagic eFORMS 800-649-1362
                                                                      www.docmagic.com

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

ALLONGE TO PROMISSORY NOTE

FOR PURPOSES OF FURTHER ENDORSEMENT OF THE FOLLOWING DESCRIBED NOTE, THIS ALLONGE IS AFFIXED AND BECOMES A PERMANENT PART OF SAID NOTE.

POOL: ███            LOAN ID: ███████████

NOTE DATE:    1/31/2007    LOAN AMOUNT:    $267,000.00

BORROWER NAME:  JOHNNY  MOORE

PROPERTY ADDRESS:   10 ROSEMARY DRIVE, STRATFORD, CT  06615

********************************************************************************************************************

PAY TO THE ORDER OF

WITHOUT RECOURSE

Residential Funding Company, LLC

By:    *amuplwan*

Name: Amy Nelson

Title: Assistant Vice President

Residential Funding Company, LLC

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

After Recording Return To:
MORTGAGE CAPITAL ASSOCIATES, INC.
11150 WEST OLYMPIC BOULEVARD,
WEST LOS ANGELES, CALIFORNIA 90064
Loan Number:

**EXHIBIT B**



**MERS RECORDED**

———————— [Space Above This Line For Recording Data] ————————

# OPEN-END MORTGAGE DEED

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** "Security Instrument" means this document, which is dated    JANUARY 31, 2007    , together with all Riders to this document.
**(B)** "Borrower" is JOHNNY RAY MOORE

Borrower is the mortgagor under this Security Instrument.
**(C)** "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(D)** "Lender" is   MORTGAGE CAPITAL ASSOCIATES, INC.

Lender is a   CALIFORNIA CORPORATION, IT'S SUCCESSORS AND/OR ASSIGNS        organized
and existing under the laws of   CALIFORNIA
Lender's address is    11150 WEST OLYMPIC BOULEVARD,          WEST LOS
ANGELES, CALIFORNIA 90064

**(E)** "Note" means the promissory note signed by Borrower and dated    JANUARY 31, 2007    .
The Note states that Borrower owes Lender   TWO HUNDRED SIXTY-SEVEN THOUSAND AND
00/100                           Dollars (U.S. $ 267,000.00    ) plus interest.
Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than
FEBRUARY 1, 2037
**(F)** "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
**(G)** "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

CONNECTICUT--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS       DocMagic ☆Formus 800-649-1362
Form 3007 01/01                              Page 1 of 13                              www.docmagic.com

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

(H)  "Riders" means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower [check box as applicable]:

| | |
|---|---|
| ☒ Adjustable Rate Rider | ☐ Planned Unit Development Rider |
| ☐ Balloon Rider | ☐ Biweekly Payment Rider |
| ☒ 1-4 Family Rider | ☐ Second Home Rider |
| ☐ Condominium Rider | ☒ Other(s) [specify] |
| | PREPAYMENT RIDER TO SECURITY INST |

(I)  "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J)  "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K)  "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L)  "Escrow Items" means those items that are described in Section 3.

(M)  "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for:  (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N)  "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O)  "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P)  "RESPA" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q)  "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender:  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower in consideration of this debt does hereby grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, the following described property located in the          COUNTY                    of          FAIRFIELD          :

[Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

CO007.mzd

VL 2997PG 252

'SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART. HEREOF AS EXHIBIT "A".
A.P.N. ███████████

which currently has the address of  10 ROSEMARY DRIVE
                                                                                    [Street]

STRATFORD                          , Connecticut    06615    ("Property Address"):
[City]                                                            [Zip Code]

TO HAVE AND TO HOLD this property unto MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:
1.    **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim

CONNECTICUT--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS        *DocMagic* ℮Ⓕⓞⓡⓜⓢ 800-649-1362
Form 3007 01/01                                    Page 3 of 13                                      www.docmagic.com

C0007.mzd

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree

CONNECTICUT--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3007 01/01                                              Page 4 of 13

*DocMagic* ☎*Forms* 800-649-1362
www.docmagic.com

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

C0007.num

in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any

CONNECTICUT—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3007 01/01                    Page 5 of 13                    DocMagic *eFormma* 800-649-1362
www.docmagic.com

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

CONNECTICUT--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3007 01/01                          Page 6 of 13

*DocMagic* 800-649-1362
www.docmagic.com

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

CONNECTICUT--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3007 01/01                                    Page 7 of 13                    DocMagic ☎ 800-649-1362
www.docmagic.com

C3007.mtd

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

VL 2997PG 257

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate

CONNECTICUT--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3007 01/01                                     Page 8 of 13

DocMagic *DocMagic* 800-649-1362
www.docmagic.com

CO3007.mnd

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's

CONNECTICUT--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3007 01/01                                Page 9 of 13

DocMagic *DocMagic* 800-649-1362
www.docmagic.com

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will

CONNECTICUT--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3007 01/01                                          Page 10 of 13

DocMagic *eForms* 800-649-1362
www.docmagic.com

state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and foreclosure or sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in court the non-existence of a default or any other defense of Borrower to acceleration and foreclosure or sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require**

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40



VL 2997 PG 261

# SCHEDULE A

# PROPERTY DESCRIPTION

All that certain piece or parcel of land, together with the buildings and improvements thereon, situated in the Town of Stratford, County of Fairfield and State of Connecticut, shown as Lot 1, on map of "Subdivision of Bard's Manor Elm Street Stratford Conn" made by Codespoti & Associates, Stratford, Conn., dated August 8, 1977, Scale 1" = 40', on file in the Stratford Town Clerk's Office, bounded:

Northerly:    On land now or formerly of Deakins & Boneh, 112.00 feet;
Easterly:     On Lot 2, as shown on said map, 95.89 feet;
Southerly:    On Rosemary Drive, 112.07 feet;
Westerly:     On Elm Street, 89.96 feet.

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke any of the remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

23. Release. Upon payment and discharge of all sums secured by this Security Instrument, this Security Instrument shall become null and void and Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waivers. Borrower waives all rights of homestead exemption in, and statutory redemption of, the Property and all right of appraisement of the Property and relinquishes all rights of curtesy and dower in the Property.

25. Future Advances. Lender is specifically permitted, at its option and in its discretion, to make additional loans and future advances under this Security Instrument as contemplated by Section 49-2(c) of the Connecticut General Statutes, and shall have all rights, powers and protections allowed thereunder.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
JOHNNY RAY MOORE            -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

Signed, sealed and delivered in the presence of:

Witness                    Witness:

CONNECTICUT--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3007 01/01                    Page 12 of 13                    DocMagic €Ferrowa 800-649-1362
                                                                   www.docmagic.com

C3007.mzd

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

VL 2997PG 263

State of Connecticut
County of   FAIRFIELD          ss:   Trumbull

The foregoing instrument was acknowledged before me this   January 31, 2007
by    JOHNNY RAY MOORE

Signature of Person Taking Acknowledgment
Joseph F. Varrone, Jr.
Commissioner of the Superior Court
Title

_____
Serial Number, if any

(Seal)                          MXXXXXHXXXHXXXHXXHXX

CONNECTICUT--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT - MERS
Form 3007 01/01                    Page 13 of 13                    DocMagic €Formus 800-649-1362
                                                                    www.docmagic.com

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

Ct3007.mid

VL 2997PG 264

Loan Number: █████████

# 1-4 FAMILY RIDER
## (Assignment of Rents)

THIS 1-4 FAMILY RIDER is made this 31st day of JANUARY, 2007 ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to
secure Borrower's Note to MORTGAGE CAPITAL ASSOCIATES, INC., A
CALIFORNIA CORPORATION
(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

10 ROSEMARY DRIVE, STRATFORD, CONNECTICUT 06615
[Property Address]

**1-4 FAMILY COVENANTS.** In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY
INSTRUMENT.** In addition to the Property described in Security Instrument, the following
items now or hereafter attached to the Property to the extent they are fixtures are added to the
Property description, and shall also constitute the Property covered by the Security Instrument:
building materials, appliances and goods of every nature whatsoever now or hereafter located
in, on, or used, or intended to be used in connection with the Property, including, but not
limited to, those for the purposes of supplying or distributing heating, cooling, electricity, gas,
water, air and light, fire prevention and extinguishing apparatus, security and access control
apparatus, plumbing, bath tubs, water heaters, water closets, sinks, ranges, stoves,
refrigerators, dishwashers, disposals, washers, dryers, awnings, storm windows, storm doors,
screens, blinds, shades, curtains and curtain rods, attached mirrors, cabinets, paneling and
attached floor coverings, all of which, including replacements and additions thereto, shall be
deemed to be and remain a part of the Property covered by the Security Instrument. All of the
foregoing together with the Property described in the Security Instrument (or the leasehold
estate if the Security Instrument is on a leasehold) are referred to in this 1-4 Family Rider and
the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower shall not seek,
agree to or make a change in the use of the Property or its zoning classification, unless Lender
has agreed in writing to the change. Borrower shall comply with all laws, ordinances,
regulations and requirements of any governmental body applicable to the Property.

**C. SUBORDINATE LIENS.** Except as permitted by federal law, Borrower shall not
allow any lien inferior to the Security Instrument to be perfected against the Property without
Lender's prior written permission.

**D. RENT LOSS INSURANCE.** Borrower shall maintain insurance against rent loss
in addition to the other hazards for which insurance is required by Section 5.

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

Us3170.rid

**E.   "BORROWER'S RIGHT TO REINSTATE" DELETED.** Section 19 is deleted.

**F.   BORROWER'S OCCUPANCY.**  Unless Lender and Borrower otherwise agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**G. ASSIGNMENT OF LEASES.**  Upon Lender's request after default, Borrower shall assign to Lender all leases of the Property and all security deposits made in connection with leases of the Property.  Upon the assignment, Lender shall have the right to modify, extend or terminate the existing leases and to execute new leases, in Lender's sole discretion. As used in this paragraph G, the word "lease" shall mean "sublease" if the Security Instrument is on a leasehold.

**H.  ASSIGNMENT OF RENTS; APPOINTMENT OF RECEIVER; LENDER IN POSSESSION.**  Borrower absolutely and unconditionally assigns and transfers to Lender all the rents and revenues ("Rents") of the Property, regardless of to whom the Rents of the Property are payable.  Borrower authorizes Lender or Lender's agents to collect the Rents, and agrees that each tenant of the Property shall pay the Rents to Lender or Lender's agents. However, Borrower shall receive the Rents until (i) Lender has given Borrower notice of default pursuant to Section 22 of the Security Instrument and (ii) Lender has given notice to the tenant(s) that the Rents are to be paid to Lender or Lender's agent.  This assignment of Rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of default to Borrower: (i) all Rents received by Borrower shall be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender shall be entitled to collect and receive all of the Rents of the Property; (iii) Borrower agrees that each tenant of the Property shall pay all Rents due and unpaid to Lender or Lender's agents upon Lender's written demand to the tenant; (iv) unless applicable law provides otherwise, all Rents collected by Lender or Lender's agents shall be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, attorney's fees, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments and other charges on the Property, and then to the sums secured by the Security Instrument; (v) Lender, Lender's agents or any judicially appointed receiver shall be liable to account for only those Rents actually received; and (vi) Lender shall be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

If the Rents of the Property are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents any funds expended by Lender for such purposes shall become indebtedness of Borrower to Lender secured by the Security Instrument pursuant to Section 9.

Borrower represents and warrants that Borrower has not executed any prior assignment of the Rents and has not performed, and will not perform, any act that would prevent Lender from exercising its rights under this paragraph.

Lender, or Lender's agents or a judicially appointed receiver, shall not be required to enter upon, take control of or maintain the Property before or after giving notice of default to Borrower.  However, Lender, or Lender's agents or a judicially appointed receiver, may do so at any time when a default occurs.  Any application of Rents shall not cure or waive any default

or invalidate any other right or remedy of Lender. This assignment of Rents of the Property shall terminate when all the sums secured by the Security Instrument are paid in full.

**I.   CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement in which Lender has an interest shall be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

_____ (Seal)          _____ (Seal)
JOHNNY RAY MOORE          -Borrower                              -Borrower


_____ (Seal)          _____ (Seal)
                          -Borrower                              -Borrower


_____ (Seal)          _____ (Seal)
                          -Borrower                              -Borrower


MULTISTATE 1-4 FAMILY RIDER
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3170 1/01                          Page 3 of 3

*DocMagic* *eForms* 800-649-1362
www.docmagic.com

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

VL 2997 PG 267

Loan Number: ███████

# ADJUSTABLE RATE RIDER
### Payment Option

THIS ADJUSTABLE RATE RIDER is made this  31st day of  JANUARY, 2007  ,
and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned
(the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to  MORTGAGE
CAPITAL ASSOCIATES, INC., A CALIFORNIA CORPORATION
(the "Lender") of the same date and covering the property described in the Security Instrument and located at:
      10 ROSEMARY DRIVE, STRATFORD, CONNECTICUT 06615

[Property Address]

**THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE
AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT
THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE.  THE
PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT
ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THE
NOTE.**

**ADDITIONAL COVENANTS.**  In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

Lender or anyone who takes the Note by transfer and who is entitled to receive payments under the
Note is called the "Note Holder."

## A.  INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

## 2.  INTEREST
(A) Interest Rate
Interest will be charged on unpaid Principal until the full amount of Principal has been paid.  I will
initially pay interest at a yearly rate of      2.500  %.  The interest rate I will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any default
described in Section 7(B) of the Note.
(B) Interest Rate Change Dates
The interest rate I will pay may change on the  1st  day of   MARCH, 2007      ,
and on that day every month thereafter.  Each date on which my interest could change is called an
"Interest Rate Change Date."  The new rate of interest will become effective on each Interest Rate Change
Date.  Although the interest rate may change monthly, my monthly payment will be recalculated in
accordance with Section 3.
(C) Interest Rate Limit
My interest rate will never be greater than      9.950 %.

---

PAYMENT OPTION MULTISTATE ADJUSTABLE RATE RIDER
MTA INDEX  02/24/06                        Page 1 of 5            *DocMagic ℮Ⓕᴼᴿᴹˢ 800-649-1362*
                                                             *www.docmagic.com*

Usrpom.rfc

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

#### (D) Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

#### (E) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding THREE AND 400/1000                    percentage point(s) (          3.400  %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Rate Change Date.

### 3.    PAYMENTS

#### (A) Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the          1st          day of each month beginning on MARCH 1, 2007                   . I will make these payments every month until I have paid all the Principal and interest and any other charges that I may owe under the Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on FEBRUARY 1, 2037          , I still owe amounts under the Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at    11150 WEST OLYMPIC BOULEVARD, #1160, WEST LOS ANGELES, CALIFORNIA 90064

or at a different place if required by the Note Holder.

#### (B) Minimum Payment; Amount of My Initial Monthly Payments

My "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment, which the Note Holder will determine in accordance with this Section 3(B), or Section 3(D), 3(F) or 3(G), below, as applicable.

Each of my initial Minimum Payments will be in the amount of U.S. $ 1,054.97 until a new Minimum Payment is required as provided below.

#### (C) Payment Change Dates

My Minimum Payment may change as required by Section 3(D) below beginning on the 1st  day of MARCH, 2008          , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My Minimum Payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different amount.

I will pay at least the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

VL 2997PG 269

#### (D) Calculation of Monthly Payment Changes

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment."

Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment that will be effective on a Payment Change Date will be in the amount of the Full Payment, except that my new Minimum Payment will be limited to an amount that will not be more than 7.5% greater than the amount of my last Minimum Payment due before the Payment Change Date (this limitation is called the "Payment Change Cap"). The Payment Change Cap applies only to the Principal and interest payment and does not apply to any escrow payments the Note Holder may require under the Security Instrument.

#### (E) Additions to My Unpaid Principal

My monthly payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. The Note Holder also will add interest on the amount of this difference to my unpaid Principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above. For each month that my monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

#### (F) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal may never exceed a maximum amount equal to 115% of the Principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid Principal under Section 3(E) above could cause my unpaid Principal to exceed that maximum amount when interest rates increase. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month, regardless of the Payment Change Cap. This amount will be my new Minimum Payment. This means that my Minimum Payment may change more frequently than annually. This new Minimum Payment amount will remain in effect until at least the next regular Payment Change Date, unless another recalculation of my Minimum Payment is required by this Section prior to such Payment Change Date.

#### (G) Required Full Payment

Regardless of the Payment Change Cap, on the   fifth   Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying at least the Full Payment as my Minimum Payment on the final Payment Change Date.

#### (H) Payment Options

After the first Interest Rate Change Date, each month the Note Holder may provide me with up to three additional payment options (in addition to the Minimum Payment) that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

> (i) **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option.

DocMagic 800-649-1362
www.docmagic.com

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

(ii) **Fully Amortized Payment:** the amount necessary to pay the loan off (including all Principal and interest) at the Maturity Date in substantially equal installments. This Payment Option is calculated on the assumption that the current interest rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change every month.

(iii) **15 Year Amortized Payment:** the amount necessary to pay the loan off (including all Principal and interest) within a fifteen (15) year period from the first payment due date in substantially equal installments. This Payment Option is calculated on the assumption that the current rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change every month.

Payment Options will only be available if they are greater than the Minimum Payment.

### (I) Failure to Make Adjustments

If for any reason the Note Holder fails to make an adjustment to the interest rate or payment amount as described herein, regardless of any notice requirement, I agree the Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold the Note Holder responsible for any damages to me that may result from the Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies that I may have paid to partial Prepayment of unpaid Principal.

## 4.   NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

PAYMENT OPTION MULTISTATE ADJUSTABLE RATE RIDER
MTA INDEX  02/24/06                                    Page 4 of 5

DocMagic €₹/₨₥₥₥ 800-649-1362
www.docmagic.com

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

NB

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal)            _____ (Seal)
JOHNNY RAY MOORE        -Borrower                                    -Borrower


_____ (Seal)            _____ (Seal)
                        -Borrower                                    -Borrower


_____ (Seal)            _____ (Seal)
                        -Borrower                                    -Borrower


PAYMENT OPTION MULTISTATE ADJUSTABLE RATE RIDER
MTA INDEX 02/24/06                           Page 5 of 5

DocMagic ℰℱℴrms 800-649-1362
www.docmagic.com

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

# PREPAYMENT RIDER

Loan Number

Date: JANUARY 31, 2007

Borrower(s): JOHNNY RAY MOORE

THIS PREPAYMENT RIDER (the "Rider") is made this 31st day of JANUARY ,
2007                    , and is incorporated into and shall be deemed to amend and supplement
the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date given by the
undersigned ("Borrower") to secure repayment of Borrower's promissory note (the "Note") in favor of
MORTGAGE CAPITAL ASSOCIATES, INC., A CALIFORNIA CORPORATION

("Lender"). The Security Instrument encumbers the Property more specifically described in the Security
Instrument and located at

10 ROSEMARY DRIVE, STRATFORD, CONNECTICUT 06615
[Property Address]

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

**A.    PREPAYMENT CHARGE**

The Note provides for the payment of a prepayment charge as follows:

**5    . BORROWER'S RIGHT TO PREPAY; PREPAYMENT CHARGE**

I have the right to make payments of Principal at any time before they are due.
A payment of Principal only is known as a "Prepayment." When I make a Prepayment,
I will tell the Note Holder in writing that I am doing so. I may not designate a payment
as a Prepayment if I have not made all the monthly payments due under the Note.

The Note Holder will use my Prepayments to reduce the amount of Principal that
I owe under the Note. However, the Note Holder may apply my Prepayment to the
accrued and unpaid interest on the Prepayment amount, before applying my Prepayment
to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be
no changes in the due dates of my monthly payment unless the Note Holder agrees in
writing to those changes.

If the Note contains provisions for a variable interest rate, my partial Prepayment
may reduce the amount of my monthly payments after the first Change Date following my
partial Prepayment. However, any reduction due to my partial Prepayment may be offset
by an interest rate increase. If this Note provides for a variable interest rate or finance
charge, and the interest rate or finance charge at any time exceeds the legal limit under

---

MULTISTATE PREPAYMENT RIDER
6/03                                    Page 1 of 2                    DocMagic *eFoms* 800-649-1362
                                                                        www.docmagic.com

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

VL 2997PG 273

which a Prepayment penalty is allowed, then the Note Holder's right to assess a Prepayment penalty will be determined under applicable law.

If within TWENTY - FOUR  (  24    ) months from the date the Security Instrument is executed I make a full Prepayment or one or more partial Prepayments, and the total of all such Prepayments in any 12-month period exceeds twenty percent (20%) of the original Principal amount of the loan, I will pay a Prepayment charge in an amount equal to  SIX        (   6     ) months' advance interest on the amount by which the total of my Prepayments within any 12-month period exceeds twenty percent (20%) of the original Principal amount of the loan.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Rider.

_____ (Seal)           _____ (Seal)
JOHNNY RAY MOORE                 -Borrower                                              -Borrower

_____ (Seal)           _____ (Seal)
                                 -Borrower                                              -Borrower

_____ (Seal)           _____ (Seal)
                                 -Borrower                                              -Borrower

FEB 0 1 2007

Received for record _____
At___ 2:44 pm ___ and recorded by me

Patricia P. Ulinowski
Patricia P. Ulinowski, Stratford Town Clerk

MULTISTATE PREPAYMENT RIDER
6/03

Page 2 of 2

DocMagic ℰℱℴℛℳℒ 800-649-1362
www.docmagic.com

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

After recording please return to:
HUNT LEIBERT JACOBSON PC
50 Weston Street
Hartford CT 06120



VL38736097

RECEIVED FOR RECORD

2010 APR 14  PM 12: 5↗55

TOWN CLERK'S OFFICE
STRATFORD, CT

### ASSIGNMENT OF MORTGAGE

POOL NUMBER_____

KNOW YE THAT **Mortgage Electronic Registration Systems, Inc. as Nominee for Mortgage Capital Associates, Inc.** ( Assignor"), having an office and place of business at 3300 SW 34th Avenue, Suite 101, Ocala, Florida 34474 ("Assignee") for the consideration of One Dollar and other valuable considerations, does hereby assign to **JPMorgan Chase Bank, National Association** ("Assignee"), having an address of 73 North Green Valley Parkway, Henderson, NV 89014, its successors, and assigns forever, all the right, title, interest, claim, and demand whatsoever as the said Assignor has or ought to have in or to a certain mortgage from Johnny Ray Moore to Mortgage Electronic Registration Systems, Inc. as Nominee for Mortgage Capital Associates, Inc. dated January 31, 2007 and recorded on February 01, 2007 in Volume 2997 at Page 250 of the Stratford Land Records, in or to the property described in said mortgage deed situated in the Town of Stratford, County of Fairfield and State of Connecticut, without warranty or representation by, or recourse to, said Assignor.

TO HAVE AND TO HOLD the premises, with all the appurtenances, unto the said Assignee, its successors and assigns forever, so that neither the Assignor nor its successors, nor any other person under it or them shall hereafter have any claim, right or title in or to the premises, or any part thereof; but therefrom it is and they are by these presents forever barred and secluded.

IN WITNESS WHEREOF, on the _13th_ day of _OCTOBER_____, 2009, said corporation has caused this deed to be executed and delivered, and its corporate seal to be hereto affixed in its behalf by _____**Barbara Hindman**_____, who is duly authorized and empowered.

Signed, sealed and delivered
In the presence of:

_Mamuno_
Nina C. Munoz

MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC. AS
NOMINEE FOR MORTGAGE CAPITAL
ASSOCIATES, INC.

By _Barbara Hindman_

Its _____**Vice President**

STATE OF __Florida_____   :
                                          : ss.
COUNTY OF __Duval_____   :

On this _13th_ day of _OCTOBER_____, 2009, b
_____**Barbara Hindman**_____ to me known, who being by me d
that he/she is a ___**Vice President**____ of MERS, Inc., which ex
that he/she knows the seal of said corporation: that the seal affixe
corporate seal, that it was so affixed by order of the Board of Director
he/she signed his/her name thereto by means of electronic process.

_Rose Hunter_
Notary Public
My Commission Expires:

**PROPERTY:**
10 Rosemary Drive
Stratford, CT 06615
Moore, Johnny Ray

ROSE HUNTER
Notary Public - State of Florida
My Comm. Expires Feb 1, 2013
Commission # DD 856913

Received for record   APR 1 4 2010
At _12.55pm_ and recorded by me

_Susan M. Pawling_
Susan M. Pawling, Town Clerk
Stratford

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

Loan Number

## LOAN MODIFICATION AGREEMENT

Borrower ("I")[1]: **JOHNNY R MOORE**
Lender ("Lender"): **JPMORGAN CHASE BANK, N.A.**
Date of First Lien Security Instrument (the "Mortgage") and Note (the "Note"): **JANUARY 31, 2007**
Loan Number: ▮▮▮▮▮▮▮ (the "Loan")
Property Address: **10 ROSEMARY DR, STRATFORD, CONNECTICUT 06615** (the "Property")

If my representations in Section 1 continue to be true in all material respects, then the provisions of Section 2 of this Loan Modification Agreement ("Agreement") will, as set forth in Section 2, amend and supplement (i) the Mortgage on the Property, and (ii) the Note secured by the Mortgage. The Mortgage and Note together, as may previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this Agreement have the meaning given to them in the Loan Documents.

I have provided confirmation of my financial hardship and documents to permit verification of all of my income to determine whether I qualify for the offer described in this Agreement. This Agreement will not take effect unless and until the Lender signs it.

1. **My Representations.** I represent to the Lender and agree:

   A. I am experiencing a financial hardship, and as a result, am either in default under the Loan Documents or a default is imminent.

   B. The Property is neither in a state of disrepair, nor condemned.

   C. There has been no change in the ownership of the Property since I signed the Loan Documents.

   D. I am not a party to any litigation involving the Loan Documents, except to the extent I may be a defendant in a foreclosure action.

   E. I have provided documentation for all income that I earn.

   F. All documents and information I provide pursuant to this Agreement are true and correct.

2. **The Modification.** The Loan Documents are hereby modified as of **FEBRUARY 01, 2013** (the "Modification Effective Date"), and all unpaid late charges are waived. The Lender agrees to suspend any foreclosure activities so long as I comply with the terms of the Loan Documents, as modified by this Agreement. The Loan Documents will be modified, and the first modified payment will be due on the date set forth in this Section 2:

   A. The Maturity Date will be: **JANUARY 01, 2053**.

   B. The modified principal balance of my Note will include all amounts and arrearages that will be past due (excluding unpaid late charges) and may include amounts towards taxes, insurance, or other assessments. The new principal balance of my Note is **$349,278.33** (the "New Principal Balance").

---

[1] If there is more than one Borrower or Mortgagor executing this document, each is referred to as "I". For purposes of this document words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

C. **\$121,128.33** of the New Principal Balance shall be deferred (the "Deferred Principal Balance") and will be treated as a non-interest bearing principal forbearance. I will not pay interest or make monthly payments on the Deferred Principal Balance. In addition, **\$102,528.33** of the Deferred Principal Balance is eligible for forgiveness (the "Deferred Principal Reduction Amount"). Provided I am not in default on my new payments such that the equivalent of three full monthly payments are due and unpaid on the last day of any month, on each of the first, second and third anniversaries of **FEBRUARY 01, 2013**, the Lender shall reduce the Deferred Principal Balance of my Note in installments equal to one-third of the Deferred Principal Reduction Amount. Application of the Deferred Principal Reduction Amount will not result in a new payment schedule. The New Principal Balance less the Deferred Principal Balance shall be referred to as the "Interest Bearing Principal Balance" and this amount is **\$228,150.00.**

The Interest Bearing Principal Balance will re-amortize over 480 months.

Interest will begin to accrue as of **JANUARY 01, 2013**. The first new monthly payment on the New Principal Balance will be due on **FEBRUARY 01, 2013**, and monthly on the same date thereafter.

This Section 2.C does not apply to the repayment of any Deferred Principal Balance and such a balance will be repaid in accordance with Section 2.D. My payment schedule for the modified Loan is as follows:

I promise to pay monthly payments according to the following schedule with respect to the Interest Bearing Principal Balance.

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal & Interest Payment Amount | Payment Begins on | Number of Monthly Payments | |
|-------|---------------|---------------------------|---------------------------------------------|-------------------|----------------------------|---|
| 1-5  | 2.000% | 01/01/2013 | \$690.90 | 02/01/2013 | 60  | |
| 6    | 3.000% | 01/01/2018 | \$802.66 | 02/01/2018 | 12  | |
| 7    | 4.000% | 01/01/2019 | \$920.64 | 02/01/2019 | 12  | |
| 8-40 | 4.375% | 01/01/2020 | \$965.97 | 02/01/2020 | 396 | |

The Lender will notify me of the payment amount prior to the date that the monthly payment on the Interest Bearing Principal Balance will change.

The Deferred Principal Balance of **\$121,128.33** less any Deferred Principal Reduction Amount to which I am entitled will be due on the maturity date unless due earlier in accordance with Section 2.D.

The above terms in this Section 2.C shall supersede any provisions to the contrary in the Loan Documents, including but not limited to provisions for an adjustable or step interest rate.

WF101 LOAN MODIFICATION AGREEMENT - CHAMP     ver. 12_24_2012_11_08_17     Page 2 of 6 pages

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

Loan Number 

D. I agree to pay in full (i) the Deferred Principal Balance less any Deferred Principal Reduction Amounts to which I am entitled, if any and (ii) any other amounts still owed under the Loan Documents, by the earliest of the date I sell or transfer an interest in the Property, subject to Section 3.E below, the date I pay the entire Interest Bearing Principal Balance, or the Maturity Date.

E. I will be in default if I do not (i) pay the full amount of a monthly payment on the date it is due, or (ii) comply with the terms of the Loan Documents, as modified by this Agreement. If a default rate of interest is permitted under the current Loan Documents, then in the event of default, the interest that will be due on the Interest Bearing Principal Balance will be the rate set forth in Section 2.C, and there will be no interest payable on the Deferred Principal Balance, if any.

F. If I make a partial prepayment of principal, the Lender may apply that partial prepayment first to any remaining Deferred Principal Balance before applying such partial prepayment to other amounts due under this Agreement or the Loan Documents.

3. **Additional Agreements**. I agree to the following:

A. That this Agreement shall supersede the terms of any modification, forbearance, or workout plan, if any, that I previously entered into with the Lender.

B. To comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of the Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, impounds, and all other payments, the amount of which may change periodically over the term of my Loan. This Agreement does not waive future escrow requirements. If the Loan includes collection for tax and insurance premiums, this collection will continue for the life of the Loan.

C. That the Loan Documents are composed of valid, binding agreements, enforceable in accordance with their terms or as modified by US Bankruptcy Code.

D. That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender and I will be bound by, and will comply with, all of the terms and provisions of the Loan Documents.

E. That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, I agree as follows: If all or any part of the Property or any interest in it is sold or transferred without the Lender's prior written consent, the Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. However, the Lender shall not exercise this option if federal law prohibits the exercise of such option as of the date of such sale or transfer. If the Lender exercises this option, the Lender shall give me notice of acceleration. The notice shall provide a period of not less than thirty (30) days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, the Lender may invoke any remedies permitted by the Mortgage without further notice or demand on me.

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

Loan Number ███████████

F.  That, as of the Modification Effective Date, a buyer or transferee of the Property will not be permitted, under any circumstance, to assume the Loan. In any event, this Agreement may not be assigned to, or assumed by, a buyer of the Property.

G.  If any document is lost, misplaced, misstated, or inaccurately reflects the true and correct terms and conditions of the Loan Documents as amended by this Agreement, within ten (10) days after my receipt of the Lender's request, I will execute, acknowledge, initial, and deliver to the Lender any documentation the Lender deems necessary to replace or correct the lost, misplaced, misstated or inaccurate document(s). If I fail to do so, I will be liable for any and all loss or damage which the Lender reasonably sustains as a result of my failure.

H.  All payment amounts specified in this Agreement assume that payments will be made as scheduled.

I.  That, if I am in bankruptcy upon execution of this document, I will cooperate fully with the Lender in obtaining any required bankruptcy court and trustee approvals in accordance with local court rules and procedures. I understand that if such approvals are not received, then the terms of this Agreement will be null and void. If this Agreement becomes null and void, the terms of the original Loan Documents shall continue in full force and effect, and such terms shall not be modified by this Agreement.

J.  If the Borrower(s) received a discharge in a Chapter 7 bankruptcy subsequent to the execution of the Loan Documents, the Lender agrees that such Borrower(s) will not have personal liability on the debt pursuant to this Agreement.

K.  That in agreeing to the changes to the original Loan Documents as reflected in this Agreement, the Lender has relied upon the truth and accuracy of all of the representations made by the Borrower(s), both in this Agreement and in any documentation provided by or on behalf of the Borrower(s) in connection with this Agreement. If the Lender subsequently determines that such representations or documentation were not truthful or accurate, the Lender may, at its option, rescind this Agreement and reinstate the original terms of the Loan Documents as if this Agreement never occurred.

L.  I acknowledge and agree that if the Lender executing this Agreement is not the current holder or owner of the Note and Mortgage, that such party is the authorized servicing agent for such holder or owner, or its successor in interest, and has full power and authority to bind itself and such holder and owner to the terms of this modification.

**THIS WRITTEN LOAN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

(SIGNATURES CONTINUE ON FOLLOWING PAGES)

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

Loan Number

## TO BE SIGNED BY BORROWER ONLY

**BORROWER** SIGNATURE PAGE TO MODIFICATION AGREEMENT BETWEEN JPMORGAN CHASE BANK, N.A. And JOHNNY R MOORE, LOAN NUMBER ▮▮▮▮▮▮▮ WITH A MODIFICATION EFFECTIVE DATE OF February 01, 2013

In Witness Whereof, the Borrower(s) have executed this agreement.

Borrower  JOHNNY R MOORE                          Date: 1, 23, 2013

WF101 LOAN MODIFICATION AGREEMENT - CHAMP          ver. 12_24_2012_11_08_17          Page 5 of 6 pages

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40

Loan Number

## TO BE SIGNED BY LENDER ONLY

**LENDER** SIGNATURE PAGE TO MODIFICATION AGREEMENT BETWEEN JPMORGAN CHASE BANK, N.A. And JOHNNY R MOORE, LOAN NUMBER               WITH A MODIFICATION EFFECTIVE DATE OF February 01, 2013

In Witness Whereof, the Lender has executed this Agreement.

Lender

**JPMORGAN CHASE BANK, N.A.**

By:

**Printed Name:**

Tonya Hawkins
Vice President

Date:   1/29/2013

Reviewer ID: Carisa_Hall_2019-11-20_12:56:40